IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

VENN THERAPEUTICS,
              Plaintiff,
vs.

CORBUS PHARMACEUTICALS
HOLDINGS, INC.

              Defendant.

Case No.

**COMPLAINT AND DEMAND FOR A JURY TRIAL**
**PRELIMINARY AND PERMANENT INJUNCTIVE REQUESTED**

Plaintiff Venn Therapeutics sues Corbus Pharmaceuticals, Inc. and alleges as follows:

**Introduction**

1.    Plaintiff Venn Therapeutics ("Venn") is a pharmaceutical company that develops therapies for cancer and other diseases.

2.    In the Fall of 2020, Venn entered discussions with Defendant Corbus Pharmaceuticals, Inc. ("Corbus") regarding a potential partnership or acquisition. During these discussions, Venn shared with Corbus trade secrets and other proprietary information concerning two promising immunotherapy programs it was developing— one for cancer, the other for fibrosis.  It did so subject to a non-disclosure agreement that prohibited Corbus from using Venn's confidential information for any purpose other than its discussions with Venn.

3.     After combing through Venn's proprietary information for months, Corbus told Venn it was not interested in moving forward with any partnership or acquisition.  However, within weeks of cutting off ties with Venn, Corbus began using Venn's trade secrets and other proprietary information to develop competing immunotherapy programs for cancer and fibrosis.

4.     Venn brings this case to stop Corbus' improper use of its trade secrets and to hold Corbus accountable for its misconduct.

## Parties

5.     Venn is a limited liability company organized under the laws of Ohio with its principal place of business in Tampa, Florida.

6.     Corbus is a corporation organized under the laws of Delaware with its principal place of business in Norwood, Massachusetts.

## Jurisdiction and Venue

7.     This Court has federal question jurisdiction over this action under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq.*, pursuant to 28 U.S.C. § 1331.

8.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims are related to the claim in this action within the Court's subject matter jurisdiction and they form part of the same case or controversy under Article III of the United States Constitution.

9.    In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy is greater than $75,000.

10.    This Court has personal jurisdiction over Corbus because Corbus does business in Florida, regularly conducts business within this state and district, and negotiated with and took actions that harmed Venn, which is headquartered in this District in Florida, and because the information and other property and rights at issue are situated within this District.  Corbus purposefully availed itself of this forum by, among other things, conducting business within Florida; conducting negotiations with and causing harm to Venn, which is headquartered in Florida; conducting those negotiations through its head of business development, Dylan Wenke, who was located in Florida throughout the majority of the negotiations; negotiating for Venn's information and property rights which are situated in Florida; and misappropriating Venn's trade secrets and confidential information which are situated in Florida.

11.    This Court's exercise of personal jurisdiction over Corbus is consistent with the Constitutions of the United States and the State of Florida.

12.    Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.  Venn is headquartered in this District, and Venn's information and property rights at issue are situated within this District.  In addition, Dylan Wenke, head of business development at Corbus and one of the primary points

of contact during discussions between Venn and Corbus, was located in this District while the majority of the discussions between Venn and Corbus occurred.

## Facts

**I.    Venn developed confidential and trade secret information regarding its immunotherapy programs based on antibodies VTX-001 and VTX-002.**

13.    In April 2018, Venn licensed rights to a monoclonal antibody from the University of California.  Venn gave that antibody the code-name VTX-001.

14.    VTX-001 inhibits cancer growth by inhibiting a cell receptor called integrin $\alpha v\beta 8$.  Integrin $\alpha v\beta 8$ plays a key role in tumor cell growth.

15.    From April 2018 through the present, Venn has had exclusive rights to develop VTX-001 for commercial purposes.

16.    Since it licensed VTX-001, Venn has spent over three years and millions of dollars developing a promising immunotherapy for cancer based on VTX-001.

17.    During Venn's development process, Venn conducted numerous experiments and made many strategic decisions about how to make its immunotherapy program based on VTX-001 successful.

18.    One important aspect of drug development is effectiveness, i.e., how potent the drug is at treating the target disease.  Venn performed numerous experiments testing the effectiveness of VTX-001 at inhibiting integrin $\alpha v\beta 8$.  The results showed that VTX-001 was highly effective.

19.    A second critical component of drug development is safety.  Many potential drugs that exhibit strong potency fail because they are also unsafe to use.

4

Venn performed numerous experiments testing the safety of VTX-001, including animal testing. The results showed that VTX-001 was safe, even at high concentrations.

20. A third important part of drug development is developing parameters for the design, manufacture, and administration of the drug, particularly at a large scale. Identifying these parameters is commonly known as "Chemistry, Manufacturing, and Controls," or "CMC." Through a laborious CMC process, Venn identified parameters for the design, manufacture, and administration of an immunotherapy based on VTX-001 under which it could be manufactured and administered reliably at scale.

21. In addition, Venn designed a detailed protocol for Phase I clinical trials of an immunotherapy based on VTX-001. Phase I clinical trials are the first phase of human testing and a critical stage of the drug development process.

22. Separate from its VTX-001 cancer program, Venn also was developing an immunotherapy for fibrosis based on a molecule code-named VTX-002. Fibrosis is a pathological wound healing process that results in scarring and can disrupt organ functionality.

23. Like VTX-001, VTX-002 is a monoclonal antibody that binds to integrin cell receptors. Unlike VTX-001, however, VTX-002 targeted two integrins, not just one. VTX-002 targeted both integrin $\alpha v \beta 6$ and integrin $\alpha v \beta 8$.

24. Venn's strategy of targeting both integrins with a single antibody was novel, and the result of Venn's scientific and creative thinking. Until the Spring of 2021 (when, as alleged below, Corbus began developing a similar fibrosis program by

improperly using Venn's proprietary information), Venn was the only company with a fibrosis program designed to target both of these integrins with the same antibody. Thus, Venn had developed confidential and proprietary information regarding both its VTX-001 cancer program and its VTX-002 fibrosis program.

## II. Venn planned to acquire exclusive rights to a child molecule of VTX-001 for its cancer immunotherapy program.

25.    In drug development, it is common to create new molecules by making small changes to the chemical structure of existing molecules with desirable pharmacological properties.  The purpose of this is to further improve the existing molecule's desirable pharmacological properties.  A new molecule created in this way is called the "child" of the existing molecule (the "parent").

26.    After scientists at the University of California developed VTX-001 and the University licensed VTX-001 to Venn, those scientists made small changes to VTX-001's chemical structure to create a child molecule of VTX-001.  The child molecule is an antibody very similar to VTX-001, but preliminary studies suggested that it was potentially even more potent at inhibiting integrin $\alpha v \beta 8$.

27.    The University of California informed Venn about the development of the child molecule.  It had performed relatively little testing on the child molecule. However, based on the similarities between the child molecule and VTX-001 (its parent), Venn expected that the child molecule would be a very promising immunotherapy lead.  Because VTX-001 and the child molecule had very similar structures, there was a high likelihood that they shared pharmacological attributes and

6

would behave in similar ways under similar conditions.  Indeed, that is why scientists and companies develop child molecules—because they expect them to behave similarly to their parent.

28.    As described above, Venn had performed extensive testing on VTX-001, which established that VTX-001 was extremely promising.  Therefore, the child molecule's very similar structure suggested that the child molecule would behave similarly to VTX-001 and would share the same positive pharmacological characteristics.

29.    In addition, there was a high likelihood that the same steps that were successful in developing VTX-001 would be successful in developing the child molecule.  Therefore, Venn expected that it would be able to make use of the work it had done on VTX-001 to develop an immunotherapy based on the child molecule quickly and cost effectively.

30.    Because Venn knew the child molecule was likely to be promising based on the work it had done on VTX-001, Venn intended to license the child molecule from the University of California and incorporate it into its immunotherapy program.

31.    On March 11, 2020, Venn entered an exclusive negotiation agreement with the University of California, according to which the University agreed to negotiate exclusively with Venn until July 31, 2020 for the licensing of the derivative molecule.  The exclusive negotiations period was then extended to December 31, 2020.  Venn paid for the exclusive negotiating rights and the extension of the negotiating period.

32.   The exclusive negotiation agreement required Venn to obtain a certain amount of funding to obtain the license.  Venn was just shy of this funding requirement in November 2020, and it hoped that an investment or partnership with another pharmaceutical company would put it over the threshold.

33.   Venn's information about the child molecule of VTX-001, including that a "child" molecule of VTX-001 that exhibited potentially even greater anti-integrin activity than VTX-001 existed and Venn's plans to license it, were Venn's confidential and trade secret information.

III.   **Venn's confidential and trade secret information about its drug programs was valuable because it was secret.**

34.   Venn's confidential and trade secret information about VTX-001, the child molecule of VTX-001, and VTX-002 was extremely valuable.  It showed that Venn's cancer immunotherapy and fibrosis programs were promising and had potential to be developed into marketable, profitable drugs.  Drug programs with this potential have high economic value and are attractive to potential investors, partners, and buyers.

35.   Moreover, the value of Venn's information was substantially derived from its secrecy.

36.   Venn's proprietary information provided compelling evidence that VTX-001 and VTX-002 could form the bases of promising, effective, and safe immunotherapies.  So long as that information was known only to Venn, Venn could pursue such immunotherapies without competition.  If the information became known

to other companies, however, those companies could use it to decide to license or create antibodies that are similar to VTX-001 or VTX-002 and develop their own, competing therapies based on such antibodies. Venn would then face direct competition from similar programs.

37.     In addition, Venn's proprietary information not only showed *that* antibodies like VTX-001 could form the basis of a promising immunotherapy, but also provided a roadmap showing *how* to develop such a therapy. For example, Venn spent a substantial amount of time and money determining optimal design, manufacturing, and administration conditions for an immunotherapy based on VTX-001. It also developed a detailed protocol for conducting Phase I clinical trials. So long as that information remained secret, only Venn could use it to advance a therapy based on VTX-001 or a similar antibody into clinical trials. If it became known to competitors, however, those competitors could use it for that same purpose too. This would eliminate any competitive advantage that the information conferred on Venn.

38.     Venn's proprietary information about the child molecule of VTX-001 was also valuable because it was secret. So long as that information was known only to Venn, there was no risk that another company would attempt to license the child molecule and develop a program that would compete with Venn's. If a competitor knew what Venn knew about the child molecule, that competitor could use that information to license the child molecule and develop a competing program with it. This would eliminate the competitive advantage that the information conferred on Venn.

9

**IV.    Venn took reasonable measures to protect the secrecy of its confidential and trade secret information.**

39.    Because it was important to the value of Venn's therapeutic programs that the information about those programs remain confidential, Venn took affirmative steps to preserve the secrecy of that information.

40.    Venn's physical facilities were locked at all times and required the use of a trackable keycard for access.

41.    The confidential and proprietary information concerning Venn's drug programs was stored in electronic data rooms accessible only through a password-protected account that had been granted access.

42.    Venn provided access to its electronic data rooms only on a need-to-know basis and terminated access immediately when it was no longer needed.

43.    Before granting access to Venn's confidential and proprietary information, Venn required employees, contractors, and consultants to sign confidentiality agreements in which they agreed not to copy, use, or disclose the information for any purpose.

44.    Venn regularly discussed confidentiality with its employees during team meetings.

45.    Venn granted access to its confidential and proprietary information to third parties rarely and only on a need-to-know basis.  Before Venn did so, it required those third parties to sign strict confidentiality agreements prohibiting any copying, use, or disclosure of the confidential and proprietary information.

V.     **Venn and Corbus entered a nondisclosure agreement.**

46.     Venn and Corbus were introduced in November 2020.

47.     At the time Venn and Corbus were introduced, Corbus was focused exclusively on drugs targeting the endocannabinoid system.   It had never been involved in developing a drug that targeted integrins.

48.     After being introduced to Corbus, Venn sent Corbus a non-confidential slide deck, which contained high-level, non-confidential information about Venn's drug programs.   The purpose of Venn's non-confidential slide deck was to provide enough information to potential partners or investors to gauge whether they were interested in learning more.   If there was initial interest, then Venn would provide additional, confidential information to the potential partner or investor confidentially under a nondisclosure agreement, to allow the potential partner to conduct diligence. This method of information-sharing is common in the pharmaceutical industry because it facilitates due diligence while reducing unnecessary sharing of confidential information with third parties.

49.     After receiving Venn's non-confidential slide deck, Corbus wanted to learn more.   Corbus sent Venn a Mutual Nondisclosure Agreement that Corbus had prepared.

50.     Venn executed the Mutual Nondisclosure Agreement as drafted by Corbus on November 14, 2020, and sent the executed copy to Corbus for signature.

51.    Corbus executed the Agreement and returned the fully executed copy to Venn on November 16, 2020.  A true and correct copy of the fully executed Agreement is attached as <u>Exhibit A</u>.

52.    In the Agreement, Corbus promised "not to use any Confidential Information disclosed to it by the other party for its own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Relationship." The "Relationship" was defined as "explor[ing] a possible business opportunity of mutual interest regarding [Venn] and its business operations involving the development of therapeutics targeting integrins for the treatment of human conditions (the 'Relationship')."

53.    "Confidential Information" was defined as "any oral, written, graphic or machine-readable information including, but not limited to, that which relates to patents, patent applications, research, product plans, products, developments, inventions, processes, designs, drawings, engineering, formulae, markets, regulatory information, medical reports, clinical data and analysis, reagents, cell lines, biological materials, chemical formulas, business plans, agreements with third parties, services, customers, marketing or finances of the disclosing party, which Confidential Information is designated in writing to be confidential or, if given orally or in other intangible form, provided under circumstances reasonably indicating it is confidential or proprietary or confirmed in writing as having been disclosed as confidential or proprietary within a reasonable time (not to exceed thirty (30) days) after the oral disclosure."

12

54.     Corbus also promised not to "disclose or permit disclosure of any Confidential Information of the other party to third parties or to employees of the party receiving Confidential Information, other than directors, officers, employees, consultants and agents who are required to have the information in order to carry out the discussions regarding the Relationship and who are bound by confidentiality agreements" and that it would "take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of the other party in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized under this Agreement to have any such information."

55.     The Agreement also provided: "Any materials or documents that have been furnished by one party to the other in connection with the Relationship shall be promptly returned by the receiving party, accompanied by all copies of such documentation, within ten (10) days after [] the Relationship has been rejected or concluded."

56.     In the Agreement, Corbus agreed that "monetary damages would be inadequate to compensate the disclosing party for any breach by the receiving party" and agreed and acknowledged that any "violation or threatened violation would cause irreparable injury to the disclosing party and that, in addition to any other remedies that may be available, in law, in equity or otherwise, the disclosing party shall be entitled to obtain injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by the receiving party, without the necessity of proving actual damages."

57.    The Agreement also provides: "This agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the Commonwealth of Massachusetts, without giving effect to its principles of conflicts of law."

**VI.    Venn shared its confidential and trade secret information with Corbus under the nondisclosure agreement.**

58.    Once Corbus had signed the Agreement, Venn provided Corbus detailed confidential and trade secret information about its drug development programs for the purpose of exploring the possible business opportunity identified above.

59.    This included granting Corbus access to a confidential electronic data room containing information about Venn's drug programs.  Venn granted access to Corbus employees and agents on a need-to-know basis, upon Corbus' request.  In total, Corbus requested access for, and Venn gave access to, over 25 Corbus employees and agents.

60.    The confidential data room that Corbus had access to contained Venn's confidential and proprietary data, reports, and analyses from its work developing VTX-001 and VTX-002, in addition to other confidential and proprietary documents regarding its drug programs.

61.    Venn also arranged for its expert consultants to give Corbus several presentations about Venn's drug programs.  In these presentations, Venn's consultants

walked Corbus through various aspects of Venn's programs in detail, including effectiveness, safety, and CMC.

62.    In addition, Venn disclosed to Corbus the existence of the child antibody of VTX-001, its expectations that the child molecule would perform similarly to VTX-001, and its plan to license the child molecule from the University of California.

63.    Thus, during Corbus' diligence, Venn provided Corbus with detailed confidential and trade secret information about its drug programs.  Venn designated this information to be confidential in writing, and information given orally or in other intangible form was provided under circumstances reasonably indicating it is confidential or proprietary.

64.    Venn provided all of the confidential and trade secret information to Corbus in reliance upon Corbus' promises in the Agreement to keep that information strictly confidential and use it only for the potential business relationship between the companies.

**VI.    Corbus used Venn's confidential and trade secret information to pursue its own, competing drug programs.**

65.    Venn had shared its valuable confidential and trade secret information with Corbus with the goal of entering into a business relationship, but Corbus used the information it got from Venn for a different purpose.  Rather than form a business relationship with Venn, Corbus broke off negotiations with Venn and used Venn's confidential and trade secret information to develop its own, competing programs that precisely mirror Venn's programs.

15

66.     In February 2021, Venn and Corbus were finalizing negotiations regarding an acquisition of Venn's assets by Corbus.  Corbus had sent Venn a term sheet proposal for the acquisition, Venn and Corbus exchanged drafts back and forth, and the parties had reached agreement on most of the core terms, including monetary terms.

67.     On Corbus' side, the negotiations were carried out primarily by Dylan Wenke, Corbus' head of business development, and Yuval Cohen, Corbus' Chief Executive Officer.

68.     During the negotiation process, Corbus consistently represented to Venn that it was excited about the deal, that it intended to move forward with the deal, and that it was committed to moving quickly.  As just one example, Corbus' CEO wrote to Venn in an email that "We're really excited about the possibility of advancing this platform" and that "We're committed to moving quickly from our side."

69.     On February 24, however, Corbus abruptly terminated the negotiations. Corbus did not offer any explanation besides that Corbus "need[ed] more time to conduct additional work" and that "it wouldn't be right for us to hold you back from moving forward with other potential partners."

70.     Venn was surprised.  The parties had already reached agreement on core terms.  Corbus had repeatedly represented that it intended to move forward with the deal.  And Corbus provided no explanation—nothing discovered during diligence, or anything else—for Corbus' sudden change of heart.

71.     The real reason that Corbus broke off negotiations, Venn later learned, is that Corbus intended to develop its own, competing drug programs modeled off of Venn's programs and using Venn's trade secrets, rather than acquire Venn's assets. Within two weeks of breaking off negotiations with Venn, Corbus reached out to the University of California to license the child molecule of VTX-001 and develop its own immunotherapy program with that antibody.

72.     On March 10, the University of California informed Venn that another company was interested in licensing the child antibody.

73.     Venn was again surprised.  Because very little testing of the molecule had been done, there was nothing—other than Venn's confidential information regarding the parent, VTX-001—that would interest another company.  Indeed, there was no publicly available information that the child molecule even existed.  And the only other companies with knowledge of Venn's confidential information had signed contracts promising not to use that information for their own benefit.

74.     The University of California requested that Venn submit a proposal to license the child molecule by the end of March if it was interested in doing so.  Venn submitted a proposal.

75.     On April 7, the University of California rejected Venn's proposal to license the child antibody and indicated that it intended to negotiate with the other company that had expressed interest.

76.     Venn later found out that company was Corbus, when Corbus issued a press release on June 1 stating that it had licensed the child molecule from the

17

University of California and that it was planning to use it to develop an immunotherapy to treat cancer by inhibiting integrin αvβ8 activation of TGF-β.

77.     Corbus used Venn's confidential and trade secret information about VTX-001 in deciding to license the child antibody.

78.     For example, Corbus only learned of the existence of the child molecule through Venn's confidential information.

79.     As a second example, because Venn's proprietary information provided evidence that VTX-001 was an extremely promising antibody for developing an immunotherapy, Corbus knew that the very similar child antibody would be similarly promising.

80.     In addition, Venn's confidential and trade secret information showed not only *that* the child antibody was promising; it also showed *how* to develop the child antibody into a promising immunotherapy program.  Because of the similarity of the antibodies, Corbus knew that it would be able to develop the child antibody quickly and efficiently with knowledge of the steps Venn took in developing VTX-001 that led to success.

81.     Indeed, Corbus would not even have known about the existence of the child molecule if Venn had not disclosed to Corbus its confidential plans to license the child molecule and incorporate it into the cancer immunotherapy program.

82.     Thus, when it decided to license the child antibody and pursue its own immunotherapy program based on that antibody, Corbus knew that the child antibody was a promising candidate for a cancer immunotherapy, and that Corbus would be

able to develop an immunotherapy based on the child antibody quickly and efficiently. Corbus had this knowledge—and indeed the knowledge that the child antibody existed—only because Venn shared its confidential and trade secret information with Corbus under the Agreement.  And Corbus used this knowledge in its decision to license and develop the child antibody.

83.     In addition, Corbus has used and is continuing to use Venn's confidential and trade secret information in developing its immunotherapy program based on the child antibody.

84.     For example, knowing which steps led to success in Venn's development of VTX-001 allows Corbus to streamline its development of the child antibody because those same steps are likely to be successful for the very similar child antibody.  Thus, Corbus is able to avoid spending much of the time and money that Venn did in developing VTX-001.  This has and will shave substantial time and money off of Corbus' development process.

85.     In addition to copying Venn's cancer immunotherapy program, Corbus also copied Venn's fibrosis program.

86.     After breaking off negotiations with Venn, Corbus acquired a different antibody that targets both integrin $\alpha v \beta 6$ and integrin $\alpha v \beta 8$, and is now developing a fibrosis treatment based on that antibody.

87.     Venn found out about Corbus' new fibrosis program in the same June 1, 2021, press release in which Corbus announced the launch of its cancer immunotherapy program.  In that same press release, Corbus announced the launch

19

of its fibrosis program with an antibody that targets both integrin αvβ6 and integrin αvβ8. The press release stated that "Corbus believes targeting both integrins at once is a rational approach to treating fibrotic diseases."

88.     Corbus used Venn's confidential and trade secret information regarding its fibrosis program in deciding to acquire this antibody and develop a fibrosis program around it.

89.     Corbus would not have understood the benefits of targeting both integrins with a single antibody if Venn had not shared confidential and trade secret information about its VTX-002 program with Corbus.

90.     Moreover, Corbus has used and is intending to continue using Venn's confidential and trade secret information, including Venn's strategies for development, in developing its new fibrosis program.

## VII.  Corbus' use of Venn's confidential and trade secret information has caused and continues to cause Venn harm.

91.     Corbus' use of Venn's confidential trade secret information has caused significant harm to Venn.

92.     To begin, Venn was unable to license the child molecule that it intended to incorporate into its immunotherapy program because Corbus did so.

93.     In addition, Venn's immunotherapy and fibrosis programs now face direct competition from Corbus' mirror-image programs. This competition reduces the value of Venn's programs.

94.     Moreover, Venn has lost and may continue to lose potential partnerships and investments due to Corbus' competing program.

**Count I**
**Breach of Contract**

95.     Venn realleges and incorporates by reference paragraphs 1 through 94 of the Complaint.

96.     Venn and Corbus entered into the Mutual Nondisclosure Agreement, a valid, written contract supported by valid consideration.  Under the Agreement, both parties agreed not to make copies of, disclose, or use the other's confidential information for purposes other than pursuing a potential business relationship.

97.     Venn was ready, willing, and able to perform its part of the contract. Venn performed all of its obligations under the contract.  Venn never made copies of, disclosed, or used any of Corbus' confidential information for any unauthorized purpose.

98.     Corbus breached the Agreement by using Venn's confidential information for purposes not allowed under the Agreement.  For example, Corbus used Venn's confidential information for its own purposes in licensing, launching and developing its own, competing drug programs modeled after Venn's programs.

99.     As a result of Corbus' breach of the Agreement, Venn has suffered, and will continue to suffer, harm.

100.    Corbus' actions have caused and will continue to cause damages in an amount to be determined at trial but also have caused and will continue to cause Venn

irreparable harm if not preliminarily and permanently enjoined. The irreparable harm to Venn consists of potential loss of business goodwill, misappropriation of trade secrets, breach of confidentiality, loss of competitive advantage, and increased difficulty developing its core business programs, all of which cannot be adequately compensated by money damages.

101.    Venn has no adequate remedy at law because Corbus' action are affecting its goodwill, reputation, and ability to compete in a highly competitive marketplace.

102.    Unless Corbus is preliminarily and permanently enjoined and restrained from using Venn's confidential information, and is preliminarily and permanently enjoined from conduct which will result in the inevitable disclosure of Venn's confidential information, Venn will suffer substantial and irreparable injury.

103.    Venn is entitled to temporary, preliminary, and permanent injunctive relief and damages based on Corbus' breach of the Mutual Nondisclosure Agreement.

104.    Venn seeks all monetary and nonmonetary remedies as allowed by law.

### Count II
### Misappropriation of Trade Secrets under the Defend Trade Secrets Act

105.    Venn realleges and incorporates by reference paragraphs 1 through 94 of the Complaint.

106.    Venn owns information that qualifies as "trade secrets" within the meaning of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq.* That information includes documents, data, results, analysis, strategies, and other information regarding Venn's VTX-001 and VTX-002 programs, as well as

information about the child molecule of VTX-001, including the child molecule's existence and Venn's plans to license that molecule.

107.   Venn's trade secret information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.   Venn's trade secret information provides Venn with a competitive advantage because it is secret.   If competitors had access to Venn's trade secret information, that information would lose value.

108.   Venn has taken reasonable measures to maintain the secrecy of its trade secret information.   Among other things, Venn:

- Kept its physical facilities locked at all times and required the use of a trackable keycard for access;

- Stored its trade secret information in electronic data rooms accessible only through a password-protected account that had been granted access;

- Provided access to its electronic data rooms only on a need-to-know basis and terminated access immediately when it was no longer needed;

- Required employees, contractors, and consultants to sign confidentiality agreements in which they agreed not to copy, use, or disclose Venn's trade secret information before granting them access to that information;

- Regularly discussed confidentiality with its employees in team meetings;

- Granted access to its confidential information to third parties rarely and only on a need-to-know basis;

- Required third parties to sign strict confidentiality agreements prohibiting any copying, use, or disclosure of the Venn's trade secret information before granting them access to that information.

109.   Venn's trade secret information is related to a product that is used and intended for use in interstate and foreign commerce.  Venn is using its trade secrets to develop therapies that will undergo interstate testing and, if approved, will be sold nationally and internationally.

110.   After the parties had executed the Mutual Nondisclosure Agreement, Venn provided Corbus with access to intimate and specific knowledge of Venn's trade secret information regarding its VTX-001 and VTX-002 programs, as well as the child molecule of VTX-001.

111.   Corbus acquired Venn's trade secret information by improper means, including by acquiring it under the promise that it would use the information only for carrying out discussions concerning, and the undertaking of, the potential relationship, and then using Venn's trade secrets for other purposes.

112.   Corbus has used, continues to use, and will use Venn's trade secret information without Venn's consent, including by using that information in its decisions to launch two directly competing drug programs and in the development of those programs.

113.   At the time Corbus acquired and used Venn's trade secrets, Corbus knew or had reason to know that its knowledge of Venn's trade secrets was acquired by improper means.

114.   At the time that Corbus acquired and used Venn's trade secrets, Corbus knew or had reason to know that its knowledge of Venn's trade secrets was acquired under a duty to Venn to maintain their secrecy and to limit their use.  As a party to—indeed the drafter of—the Mutual Nondisclosure Agreement, Corbus certainly had reason to know that it acquired Venn's trade secrets under a duty to maintain their secrecy and limit their use.

115.   As a direct and proximate result of Corbus' misappropriation of Venn's trade secrets, Venn has sustained substantial damage in an amount to be established at trial.

116.   Corbus' actions in converting and misappropriating Venn's trade secrets for its own gain were willful and malicious and were taken with reckless disregard for Venn's rights.

117.   Corbus' actions have caused and will continue to cause damages in an amount to be determined at trial but also have caused and will continue to cause Venn irreparable harm if not preliminarily and permanently enjoined.  The irreparable harm to Venn consists of potential loss of business goodwill, misappropriation of trade secrets, breach of confidentiality, loss of competitive advantage, and increased difficulty developing its core business programs, all of which cannot be adequately compensated by money damages.

25

118.    Venn has no adequate remedy at law because Corbus' actions are affecting its goodwill, reputation, and ability to compete in a highly competitive marketplace.

119.    Unless Corbus is preliminarily and permanently enjoined and restrained from using Venn's trade secrets, and is preliminarily and permanently enjoined from conduct which will result in the inevitable disclosure of Venn's trade secrets, Venn will suffer substantial and irreparable injury.

120.    Venn is entitled to temporary, preliminary, and permanent injunctive relief and damages based on Corbus' misappropriation, threatened disclosure, and inevitable disclosure of Venn's trade secrets under 18 U.S.C. § 1836(b)(3).

121.    Venn seeks all monetary and nonmonetary remedies as allowed by law.

<u>Count III</u>
**Misappropriation of Trade Secrets under the Massachusetts Uniform Trade Secret Act**

122.    Venn realleges and incorporates by reference paragraphs 1 through 94 of the Complaint.

123.    Venn owns information that qualifies as "trade secrets" within the meaning of the Massachusetts Uniform Trade Secrets Act, Massachusetts G.L. c. 93 § 42, *et seq*.  That information includes documents, data, results, analysis, strategies, and other information regarding Venn's VTX-001 and VTX-002 programs, as well as information about the child molecule of VTX-001, including the child molecule's existence and Venn's plans to license that molecule.

124.   Venn's trade secret information provided economic advantage from not being generally known to, and not being readily ascertainable by proper means by, others who might obtain economic advantage from its acquisition, disclosure, or use. Venn's trade secret information provided Venn with a competitive advantage because it is secret.   If competitors had access to Venn's trade secret information, that information would lose value.

125.   Venn has taken reasonable efforts to protect its trade secret information against it being acquired, disclosed, or used without Venn's consent.   Among other things, Venn:

- Kept its physical facilities locked at all times and required the use of a trackable keycard for access;

- Stored its trade secret information in electronic data rooms accessible only through a password-protected account that had been granted access;

- Provided access to its electronic data rooms only on a need-to-know basis and terminated access immediately when it was no longer needed;

- Required employees, contractors, and consultants to sign confidentiality agreements in which they agreed not to copy, use, or disclose Venn's trade secret information before granting them access to that information;

- Regularly discussed confidentiality with its employees in team meetings;

- Granted access to its confidential information to third parties rarely and only on a need-to-know basis;

- Required third parties to sign strict confidentiality agreements prohibiting any copying, use, or disclosure of the Venn's trade secret information before granting them access to that information.

126.    After the parties had executed the Mutual Nondisclosure Agreement, Venn provided Corbus with access to intimate and specific knowledge of Venn's trade secret information regarding its VTX-001 and VTX-002 programs, as well as the child molecule of VTX-001.

127.    Corbus acquired Venn's trade secret information by improper means, including by promising that it would use the information only for carrying out discussions concerning, and the undertaking of, the potential relationship, and then using Venn's trade secrets for other purposes.

128.    Corbus has used, continues to use, and will use Venn's trade secret information without Venn's consent, including by using that information in its decisions to launch two directly competing drug programs and in the development of those programs.

129.    At the time Corbus acquired and used Venn's trade secrets, Corbus knew or had reason to know that its knowledge of Venn's trade secrets was acquired by improper means.

130.    At the time that Corbus acquired and used Venn's trade secrets, Corbus knew or had reason to know that its knowledge of Venn's trade secrets was acquired under a duty to Venn to maintain their secrecy and to limit their use.  As a party to— indeed the drafter of—the Mutual Nondisclosure Agreement, Corbus certainly had

28

reason to know that it acquired Venn's trade secrets under a duty to maintain their secrecy and limit their use.

131.   As a proximate result of Corbus' misappropriation of Venn's trade secrets, Venn has sustained substantial damage in an amount to be established at trial.

132.   Corbus' actions in converting and misappropriating Venn's trade secrets for its own gain were willful and malicious and were taken with reckless disregard for Venn's rights.

133.   Corbus' actions have caused and will continue to cause damages in an amount to be determined at trial but also have caused and will continue to cause Venn irreparable harm if not preliminarily and permanently enjoined.  The irreparable harm to Venn consists of potential loss of business goodwill, misappropriation of trade secrets, breach of confidentiality, loss of competitive advantage, and increased difficulty developing its core business programs, all of which cannot be adequately compensated by money damages.

134.   Venn has no adequate remedy at law because Corbus' action are affecting its goodwill, reputation, and ability to compete in a highly competitive marketplace.

135.   Unless Corbus is preliminarily and permanently enjoined and restrained from using Venn's trade secrets, and is preliminarily and permanently enjoined from conduct which will result in the inevitable disclosure of Venn's trade secrets, Venn will suffer substantial and irreparable injury.

136.   Venn is entitled to temporary, preliminary, and permanent injunctive relief and damages based on Corbus' misappropriation, threatened disclosure, and

29

inevitable disclosure of Venn's trade secrets under Massachusetts G.L. c. 93 §§ 42A-C.

137. Venn seeks all monetary and nonmonetary remedies as allowed by law.

## Count IV
## Intentional Misrepresentation

138. Venn realleges and incorporates by reference paragraphs 1 through 94 of the Complaint.

139. Corbus made false representations of material fact to Venn. For example, Corbus told Venn that it was terminating negotiations because it "need[ed] more time to conduct additional work" and that "it wouldn't be right for us to hold you back from moving forward with other potential partners." Those statements were false because the real reason Corbus terminated negotiations was that it had decided that it would license the child antibody of VTX-001 and an antibody that targeted integrin αvβ6 and integrin αvβ8 and develop its own, competing drug programs rather than make a deal with Venn.

140. Corbus' false statements concerned facts that were important to Venn's decisions. For example, knowing that Corbus intended to license the child antibody of VTX-001 and an antibody that targeted integrins αvβ6 and αvβ8 and develop competing programs was important to Venn's decision whether to seek to enjoin Corbus from taking such acts in violation of its contract with Venn and trade secret laws.

141.   At the time Corbus made its false representations to Venn, Corbus knew that they were false or recklessly disregarded their falsity.  For example, Corbus knew that the reason Corbus was terminating negotiations was because it planned to license the child antibody of VTX-001 from the University of California, acquire an antibody that targeted integrin αvβ6 and integrin αvβ8, and develop competing drug programs using those antibodies.

142.   Corbus intended for Venn to rely on Corbus' false statements in making decisions.  For example, Corbus did not want Venn to get in the way of its plans or seek to enjoin Corbus from following through with its breach of contract and trade secret misappropriation.

143.   Venn reasonably relied on Corbus' false representations.  For example, although Venn was surprised that Corbus was breaking off negotiations, Venn reasonably believed that Corbus was not planning to license the child antibody of VTX-001 or acquire an antibody that targeted integrin αvβ6 and integrin αvβ8 and develop competing drug programs using those antibodies.  Corbus had promised not to use Venn's information for such purposes in the Mutual Nondisclosure Agreement.

144.   As a result of Corbus' false representations and Venn's reasonable reliance on those representations, Venn acted to its detriment and suffered financial loss.  For example, Venn did not seek to enjoin Corbus from using its confidential and trade secret information in violation of its duties under its contract with Venn and the trade secret laws.  This caused financial harm to Venn as described above.

145.    As a proximate result of Corbus' fraudulent misrepresentations, Venn has suffered substantial damage in an amount to be established at trial.

146.    Venn seeks all monetary and nonmonetary remedies as allowed by law.

## Count V
### Negligent Misrepresentation

147.    Venn realleges and incorporates by reference paragraphs 1 through 94 of the Complaint.

148.    Corbus supplied false information to Venn in the course of its business. For example, Corbus told Venn that it was terminating negotiations because it "need[ed] more time to conduct additional work" and that "it wouldn't be right for us to hold you back from moving forward with other potential partners."   Those statements were false because the real reason Corbus terminated negotiations was that it had decided that it would license the child antibody of VTX-001 and an antibody that targeted integrin αvβ6 and integrin αvβ8 and develop its own, competing drug programs rather than make a deal with Venn.

149.    Corbus' false statements were made in connection with negotiations around partnering with Venn or acquiring Venn's assets, a business transaction in which Corbus had a financial interest.

150.    Corbus' false statements concerned facts that were important to Venn's decisions.  For example, knowing that Corbus intended to license the child antibody of VTX-001 and an antibody that targeted integrins αvβ6 and αvβ8 and develop competing programs was important to Venn's decision whether to seek to enjoin

Corbus from taking such acts in violation of its contract with Venn and trade secret laws.

151.   Corbus' statements were for the guidance of Venn in its business transactions.   For example, Corbus' above statements purported to explain why Corbus was terminating negotiations such that Venn could act on the information.

152.   At the time Corbus made its false statements, Venn and Corbus were in privity of contract under the Mutual Nondisclosure Agreement.

153.   Corbus failed to exercise reasonable care or competence in obtaining or communicating the information that it shared with Venn.   For example, the reason Corbus terminated negotiations was that Corbus planned to license the child antibody of VTX-001 from the University of California, acquire an antibody that targeted integrin αvβ6 and integrin αvβ8, and develop competing drug programs using those antibodies.   Corbus did not exercise reasonable care or competence in communicating this information to Venn.

154.   Venn reasonably relied on Corbus' misrepresentations.   For example, although it was surprised that Corbus was breaking off negotiations, Venn reasonably believed that Corbus was not planning to license the child antibody of VTX-001 or acquire an antibody that targeted integrin αvβ6 and integrin αvβ8 and develop competing drug programs using those antibodies.   Corbus had promised not to use Venn's information for such purposes in the Mutual Nondisclosure Agreement.

155.   As a result of Corbus' negligent misrepresentations and Venn's reasonable reliance on those representations, Venn acted to its detriment and suffered

financial loss.  For example, Venn did not seek to enjoin Corbus from using its confidential and trade secret information in violation of its duties under its contract with Venn and the trade secret laws.  This caused financial harm to Venn as described above.

156.  Corbus had actual knowledge of Venn's detrimental reliance.  For example, Corbus knew that Venn believed that Corbus was not planning to license the child antibody or the antibody targeting integrin $\alpha v \beta 6$ and integrin $\alpha v \beta 8$ or start its own programs based on these antibodies.  As another example, Corbus knew that Venn was not seeking to enjoin Corbus from doing so or attempting to raise funds to license the child antibody quickly before Corbus licensed it.

157.  As a proximate result of Corbus' negligent misrepresentations, Venn has suffered substantial damage in an amount to be established at trial.

158.  Venn seeks all monetary and nonmonetary remedies as allowed by law.

## Count VI
## Fraudulent Omission

159.  Venn realleges and incorporates by reference paragraphs 1 through 94 of the Complaint.

160.  Corbus had a duty to disclose to Venn that it was planning to license the child antibody of VTX-001 from the University of California and acquire an antibody that targeted integrin $\alpha v \beta 6$ and integrin $\alpha v \beta 8$, and that it was planning to develop competing drug programs using those antibodies.

161.    There was a relationship of trust and confidence between Venn and Corbus.  Venn had disclosed its confidential and trade secret information to Corbus under the Mutual Nondisclosure Agreement and trusted Corbus to keep that information in confidence and use it only to pursue a potential business relationship with Venn.  Thus, Corbus had a duty to disclose to Venn that it planned to use that information for a different purpose.

162.    Corbus knew that it was necessary to disclose its plans in order to prevent its partial or ambiguous statements from being misleading.  For example, when Corbus told Venn that it was breaking off negotiations because it "need[ed] more time to conduct additional work" and that "it wouldn't be right for us to hold you back from moving forward with other potential partners," Corbus knew that this statement was misleading without the additional information that Corbus was planning to develop its own, competing programs modeled off of Venn's programs.

163.    That Corbus planned to license the child antibody of VTX-001 from the University of California and acquire an antibody that targeted integrin αvβ6 and integrin αvβ8, and that it planned to develop competing drug programs using those antibodies, was basic to and went to the essence of the transaction between Venn and Corbus.  It was essential to the transaction that Corbus use Venn's confidential and trade secret information only to pursue a potential business relationship with Venn. That is the only reason that Venn shared its confidential and trade secret information with Corbus.

35

164.   Despite its duty to do so, Corbus did not disclose to Venn that it was planning to license the child antibody of VTX-001 from the University of California and acquire an antibody that targeted integrin αvβ6 and integrin αvβ8, and that it was planning to develop competing drug programs using those antibodies.

165.   Corbus' omissions concerned facts that were important to Venn's decisions.  For example, knowing that Corbus intended to license the child antibody of VTX-001 and an antibody that targeted integrins αvβ6 and αvβ8 and develop competing programs was important to Venn's decision whether to seek to enjoin Corbus from taking such acts in violation of its contract with Venn and trade secret laws.

166.   Corbus knew that its omissions were false.  For example, Corbus knew that Corbus did in fact plan to license the child antibody of VTX-001 from the University of California, acquire an antibody that targeted integrin αvβ6 and integrin αvβ8, and develop competing drug programs using those antibodies.

167.   Corbus omitted these facts for the purpose of inducing Venn to act on its omissions.  Corbus did not want Venn to get in the way of its plans or seek to enjoin Corbus from following through with its breach of contract and trade secret misappropriation.

168.   Venn reasonably relied on Corbus' omissions.  For example, Venn reasonably believed that Corbus was not planning to license the child antibody of VTX-001 or acquire an antibody that targeted integrin αvβ6 and integrin αvβ8 and

develop competing drug programs using those antibodies.  Corbus had promised not to use Venn's information for such purposes in the Mutual Nondisclosure Agreement.

169.   As a result of Corbus' fraudulent omissions and Venn's reasonable reliance on those omissions, Venn acted to its detriment and suffered financial loss. For example, Venn did not seek to enjoin Corbus from using its confidential and trade secret information in violation of its duties under its contract with Venn and the trade secret laws.  This caused financial harm to Venn as described above.

170.   As a proximate result of Corbus' fraudulent omissions, Venn has suffered substantial damage in an amount to be established at trial.

171.   Venn seeks all monetary and nonmonetary remedies as allowed by law.

## Count VII
### Interference with Advantageous Business Relations.

172.   Venn realleges and incorporates by reference paragraphs 1 through 94 of the Complaint.

173.   Venn was involved in and reasonably expected to benefit from a business relationship with the University of California, by which Venn would obtain rights to use the child antibody of VTX-001 in commercial development.  Venn and the University had entered exclusive negotiation agreements and, even after those contracts expired, were still anticipating that Venn would license the child antibody.

174.   Venn's business relationship with the University of California was for economic benefit.  Venn expected to develop an immunotherapy drug based on the child antibody, and reasonably expected that this would be profitable.

37

175.   Corbus knew about Venn's business relationship with the University of California.  Venn told Corbus about Venn's exclusive negotiation agreements with the University and knew that Venn was still planning to license the child antibody even after the exclusive negotiation period.

176.   Corbus had an improper motive and used an improper method in interfering with the relationship.  Corbus intentionally and improperly interfered with Venn's business relationship with the University of California by using Venn's confidential and proprietary information to outbid Venn for the rights to the child antibody, causing the University of California not to enter the relationship with Venn.

177.   Corbus' use of Venn's confidential and proprietary information to license the child antibody, and Corbus' fraudulent failure to disclose to Venn that it was doing so, constitute improper motive or means of interfering with Venn's business relationship with the University of California.

178.   Venn suffered damage and lost its advantage as a direct result of Corbus' conduct.  Corbus was unable to license the child antibody from the University of California and develop that antibody into a profitable immunotherapy program.  Moreover, Venn now faces direct competition from Corbus' immunotherapy program based on the child antibody.

179.   As a proximate result of Corbus' interference with Venn's advantageous business relations, Venn has suffered substantial damage in an amount to be established at trial.

180.   Venn seeks all monetary and nonmonetary remedies as allowed by law.

## Count VIII
## Unjust Enrichment

181.   Venn realleges and incorporates by reference paragraphs 1 through 94 of the Complaint.

182.   Venn conferred a measurable benefit upon Corbus.  For example, Venn provided Corbus information about Venn's drug programs and the child molecule of VTX-001.  This information enabled Corbus to develop its own, competitive drug programs using this information.

183.   Venn reasonably expected compensation from Corbus if Corbus was going to use the information for its own purposes.

184.   Corbus knew and appreciated the benefit that it received from obtaining knowledge of Venn's information.

185.   Corbus accepted and retained the benefit of Venn's information under circumstances that would make it inequitable for Corbus to retain the benefit without paying Venn for the value of the information.

186.   Venn has no adequate remedy at law.

187.   Venn seeks all monetary and nonmonetary remedies as allowed by law.

## Count IX
## Unfair Methods of Competition or Deceptive Acts or Practices under Massachusetts G.L. c. 93A § 11.

188.   Venn realleges and incorporates by reference paragraphs 1 through 94 of the Complaint.

189.   Venn and Corbus both engage in the conduct of trade or commerce as defined under Massachusetts G.L. c. 93A § 1(b).  Both are commercial pharmaceutical companies.

190.   Corbus' conduct in relation to Venn, as set forth above, constitutes unfair methods of competition and unfair and/or deceptive trade practices in violation of Massachusetts G.L. c. 93A § 2.

191.   Corbus' unfair and deceptive conduct was a willful and knowing violation of Massachusetts G.L. c. 93A § 2 and Venn's rights.

192.   Corbus' unfair and deceptive conduct occurred primarily and substantially in Massachusetts, where Corbus is headquartered.

193.   As a proximate result of Corbus' unfair and deceptive conduct, Venn has suffered substantial damage in an amount to be established at trial.

194.   Venn seeks all monetary and nonmonetary remedies as allowed by law.

**Request for Injunctive Relief**

195.   Venn realleges and incorporates by reference paragraphs 1 through 93 of the Complaint.

196.   Venn has a substantial likelihood of success on at least one of its claims asserted in this Complaint.

197.   Unless Corbus is enjoined from engaging in additional misconduct, Venn will suffer irreparable harm in the form of loss of business goodwill, misappropriation of trade secrets, breach of confidentiality, loss of competitive advantage, and increased

difficulty developing its core business programs, all of which cannot be adequately compensated by money damages.

198.    The substantial injury that Venn will suffer if Corbus' misconduct is not enjoined outweighs any injury that an injunction will cause Corbus, who has no right to use or disclose Venn's confidential and trade secret information in the first place.

199.    The public interest favors an injunction to uphold the sanctity of contract, to protect investment in research and development, to protect trade secrets from unlawful misappropriation, and to eliminate Corbus' unearned competitive advantage.

## Prayer for Relief

Wherefore, Venn respectfully requests that the Court enter judgment in its favor and against Corbus as follows:

- For damages in an amount to be determined at trial;

- For punitive and treble damages;

- For injunctive relief restraining Corbus from disclosing or using, directly or indirectly, for itself or others, any of Venn's trade secrets or confidential information;

- For costs, expenses, and attorneys' fees incurred in connection with this action;

- For such other and further relief as the Court deems just and proper.

## Jury Demand

Venn requests a jury in this matter on all issues triable by jury.

Date: November 18, 2021                    Respectfully submitted,

                                           /s/ David L. Luikart
Simon Franzini (Cal. Bar No. 287631)*      David L. Luikart III (Fla. Bar No. 21709)
Gabriel Z. Doble (Cal. Bar No. 335335)*    dave.luikart@hwhlaw.com
DOVEL & LUNER LLP                          HILL WARD HENDERSON
201 Santa Monica Blvd., Suite 600          101 East Kennedy Boulevard, Suite 3700
Santa Monica, California 90401             Tampa, Florida 33602
Tel: (310) 656-7066                        Tel: (813) 221-3900
*Pro Hac Vice Forthcoming

                                           *Attorneys for Plaintiff Venn Therapeutics*